**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re Wellbutrin SR<br>Antitrust Litigation<br><br>(Direct Purchaser Actions) | Civil Action No. 2:04-cv-5525<br><br>Judge Bruce W. Kauffman<br>Magistrate J. Jacob P. Hart |
| Sheet Metal Workers Local 441<br>Health & Welfare Plan, et al.,<br><br>vs.<br><br>GlaxoSmithKline, plc, et al.<br><br>(End-Payor Actions) | Civil Action No. 2:04-cv-5898<br><br>Judge Bruce W. Kauffman<br>Magistrate J. Jacob P. Hart |
| Medical Mutual of Ohio, Inc.,<br><br>vs.<br><br>GlaxoSmithKline, plc, et al. | Civil Action No. 2:05-cv-396<br><br>Judge Bruce W. Kauffman<br>Magistrate J. Jacob P. Hart |

## DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY RELEVANT TO THE PENDING MOTION FOR SUMMARY JUDGMENT AS TO ALL CLAIMS

GSK writes to bring to the Court's attention *CBS Interactive Inc. v. National Football League Players Ass'n, Inc., et al.*, No. 08-5097, 2009 WL 1151982 (D. Minn. April 28, 2009) (attached as Ex. A). *CBS Interactive* supports GSK's arguments that the objectively baseless inquiry is analogous to the standard for Rule 11 and that positions on unsettled questions urged by others in the legal community are not objectively baseless. *See id.*, at *14.

Date:  May 12, 2009

Respectfully submitted,

David P. Gersch
James W. Cooper
Daniel S. Pariser
**ARNOLD & PORTER LLP**
555 12th Street, N.W.
Washington, D.C.  20004
(202) 942-5000

Arthur Makadon
Mark S. Stewart
Leslie E. John
**BALLARD SPAHR ANDREWS &
INGERSOLL, LLP**
1735 Market Street, 51st Floor
Philadelphia, PA  19103
(215) 665-8500

*COUNSEL FOR DEFENDANTS
GLAXOSMITHKLINE, PLC AND
SMITHKLINE BEECHAM CORP. d/b/a
GLAXOSMITHKLINE*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of May, 2009, I caused a true and correct copy of Defendants' Notice of Supplemental Authority Relevant to the Pending Motion for Summary Judgment as to All Claims and accompanying Exhibit to be served by the Electronic Case Filing system and to be sent to counsel listed below via electronic mail.

Jessica P. Medina

Dianne M. Nast
Joseph F. Roda
**RODANAST, P.C.**
801 Estelle Drive
Lancaster, PA  17601
Tel: (717) 892-3000
Fax: (717) 892-1200

Michael M. Buchman
J. Douglas Richards
**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP**
100 Park Avenue, 26th Floor
New York, New York 10017
Tel: (212) 661-1100
Fax: (212) 661-8665

Joseph H. Meltzer
Terrence S. Ziegler
**SCHIFFREN & BARROWAY, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

Daniel E. Gustafson
Brian L. Williams
**GUSTAFSON GLUEK PLLC**
650 Northstar East
608 Second Ave, S.
Minneapolis, MN  55402
Tel: (612) 333-8844
Fax: (612) 339-6622

Thomas M. Sobol
Debra A. Gaw
**HAGENS BERMAN SOBOL SHAPIRO
L.L.P.**
One Main Street, 4th Floor
Cambridge, MA 02142
Tel: (617) 482-3700
**Fax: (617) 482-3003**

William Christopher Carmody
Shawn J. Rabin
Robert Rivera
Johnny W. Carter
**SUSMAN GODFREY L.L.P**
901 Main Street, Suite 5010
Dallas, TX 75202-3775
Tel: (214) 754-1900
Fax: (214) 754-1933

# EXHIBIT A

Westlaw.

Slip Copy                                                                 Page 1
Slip Copy, 2009 WL 1151982 (D.Minn.)
**(Cite as: 2009 WL 1151982 (D.Minn.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.
CBS INTERACTIVE INC., Plaintiff,
v.
NATIONAL FOOTBALL LEAGUE PLAYERS
ASSOCIATION, INC. and National Football
League Players Incorporated, Defendants.
**Civil No. 08-5097 ADM/SRN.**

April 28, 2009.

Rudolph A. Telscher, Jr., Esq., Kara R. Yancey,
Esq., and Molly B. Edwards, Esq., Harness, Dickey
& Pierce, PLC, St. Louis, MO; and Michael A.
Lindsay, Esq., and Bradley T. Smith, Esq., Dorsey
& Whitney, LLP, Minneapolis, MN, on behalf of
Plaintiff.

Jeffrey L. Kessler, Esq., David G. Feher, Esq., L.
Londell McMillan, Esq., Eva W. Cole, Esq., and
Frank C. Salzano, Esq., Dewey & LeBoeuf, LLP,
New York, NY; and Edward M. Glennon, Esq.,
Mark A. Jacobson, Esq., and Anthony N. Kirwin,
Esq., Lindquist & Vennum, PLLP, Minneapolis,
MN, on behalf of Defendants.

**MEMORANDUM OPINION AND ORDER**

ANN D. MONTGOMERY, District Judge.

**I. INTRODUCTION**

*1 On January 28, 2009, the undersigned United
States District Judge heard oral argument on De-
fendants National Football League Players Associ-
ation, Inc.'s ("NFLPA") and National Football
League Players Incorporated's ("Players Inc.")
(collectively "Defendants") Motions to Transfer
Venue [Docket Nos. 15 and 50]; Plaintiff CBS In-
teractive Inc.'s ("CBS Interactive") Motion for Par-

tial Summary Judgment [Docket No. 22]; Players
Inc.'s Motion to Dismiss for Lack of Personal Juris-
diction [Docket No. 33]; and Defendants' Motions
to Dismiss [Docket Nos. 43 and 53] for failure to
state a claim and failure to join an indispensable
party. For the reasons stated herein, Players Inc.'s
Motion to Dismiss for Lack of Personal Jurisdiction
is denied, Defendants' Motions to Transfer Venue
are denied, Defendants' Motions to Dismiss for fail-
ure to state a claim and failure to join an indispens-
able party are granted in part and denied in part,
and CBS Interactive's Motion for Partial Summary
Judgment is granted.

**II. BACKGROUND**[FN1]

> FN1. On a motion for summary judgment,
> the Court views the evidence in the light
> most favorable to the nonmoving party.
> *Ludwig v. Anderson,* 54 F.3d 465, 470 (8th
> Cir.1995).

**A. The Parties**

CBS Interactive is a Delaware corporation with its
principal place of business in California. First Am.
Compl. [Docket No. 21] ¶ 3. CBS Interactive oper-
ates the website "CBSSports.com" throughout the
United States, including Minnesota. *Id.* ¶¶
3-4.NFLPA and Players Inc. are Virgina corpora-
tions with principal places of business in Washing-
ton, D.C. Nahra Decl. ¶ 3, Sept. 30, 2008 [Docket
No. 18]; Berthelsen Decl. ¶ 3, Sept. 30, 2008
[Docket No. 19]. NFLPA is a non-profit corpora-
tion that acts as the exclusive collective bargaining
representative for active players in the National
Football League ("NFL"). Nahra Decl. ¶ 3, Sept.
30, 2008. Players Inc. is a for-profit corporation
and a partially-owned subsidiary of
NFLPA.[FN2] Berthelsen Decl. ¶ 4, Sept. 30, 2008.

> FN2. NFLPA owns 100% of Players Inc.'s

Slip Copy
Slip Copy, 2009 WL 1151982 (D.Minn.)
(Cite as: 2009 WL 1151982 (D.Minn.))

Page 2

Class A shares and 79% of Players Inc.'s Class B shares; the remaining 21% of Class B shares are owned by the Professional Athletes Foundation. Nahra Decl. ¶ 6, Oct. 17, 2008 [Docket No. 36].

**B. Group Licensing**

Through the collective bargaining agreement with NFLPA and separate "Group Licensing Agreements," the individual players assign their "Group Licensing Rights" to "NFLPA and its licensing affiliates." Telscher Decl., Oct. 6, 2008 [Docket No. 27], Ex. 2; Nahra Decl. ¶ 10, Oct. 17, 2008. NFLPA has the right to license the use of the individual players' names, signatures, facsimile, voices, pictures, photographs, likenesses, and biographical information in connection with "group licensing programs" involving six or more players. Telscher Decl., Oct. 6, 2008, Ex. 2; Nahra Decl. ¶ 10, Oct. 17, 2008. Pursuant to a separate agreement with Players Inc. that expressly confirms that NFLPA is the owner of the Group Licensing Rights, NFLPA then grants Players Inc. "the exclusive worldwide right, license, and privilege of utilizing the ... Group Licensing Rights." Telscher Decl., Oct. 6, 2008, Ex. 3, § 1(A); Nahra Decl. ¶ 11, Oct. 17, 2008. The agreement includes the following provision: "Any Group Licensing Rights obtained by Players Inc. during the term of this Agreement, or any renewals thereof, shall be the property of NFLPA and subject to the terms and conditions of this Agreement." Telscher Decl., Oct. 6, 2008, Ex. 3, § 1(E). In exchange for the right to use and sublicense the Group Licensing Rights, Players Inc. pays NFLPA a percentage of the gross licensing revenues. Nahra Decl. ¶ 13, Oct. 17, 2008.

**C. Fantasy Football**

*2 Through CBSSports.com, CBS Interactive operates "fantasy sports" games, including "fantasy football," and is a "leading provider of ... fantasy football, to sports enthusiasts throughout the country, including in one of its top markets, Minnesota."[FN3] First Am. Compl. ¶ 4; Snyder Decl. ¶ 7, Oct. 6, 2008 [Docket No. 25]. For purposes of this case, "fantasy football" refers to a game in which participants simulate management responsibilities of the roster of a NFL team by, among other things, (1) scouting, drafting, and trading players on their teams; (2) adding and dropping players; and (3) otherwise manipulating the team's roster over the course of the season-long competition. Snyder Decl. ¶ 5, Oct. 6, 2008. To facilitate the competition among the participants in a given fantasy football league, the standard fantasy football game utilizes the actual statistics generated by NFL players during the course of the regular season. *Id.*

> FN3. CBS Interactive offers both free fantasy football games, as well as more complex "payto-play fantasy games." London Decl. ¶ 6, Oct. 6, 2008 [Docket No. 26].

At or prior to the start of the NFL regular season, participants, often referred to as "owners," select NFL players for their team rosters though either a "draft" system or by bidding in an "auction." *Id.* After the participants have filled their rosters through the draft or auction, a season-long competition ensues based on the actual players' performances during the regular season games in designated statistical categories. *Id.* To be successful in managing their rosters during the course of the fantasy football season, participants access "sports news information such as performance statistics, player reviews, injury updates," and other information regarding the players and their respective NFL teams. *Id.* ¶ 6. Frequent communication and exchange of ideas with other fantasy football participants is a regular aspect of playing the game. *Id.* Broadly speaking, the winner in a given fantasy football league usually is either (1) the participant whose roster of players, at the end of the NFL regular season, has the highest totals in the designated statistical categories or (2) the participant who has the best overall record in numerous head-to-head

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

games against other participants.*Id.* Providers of fantasy football games typically track, compile, and post the publicly available statistics of the players to enable their customers, the participants, to see whose team is winning and to aid the participants in deciding which players to add, drop, trade, or start each week. First Am. Compl. ¶ 12. CBS Interactive, like other fantasy football providers, supplies its participants with "player profiles, up-to-date statistics, injury reports, participant blogs, and other factual information about all players within the National Football League."London Decl. ¶ 7, Oct. 6, 2008.

Due to the popularity of the NFL itself, fantasy football is one of the most popular fantasy sports games. Snyder Decl. ¶ 7, Oct. 6, 2008. In September 2007, one researcher estimated that between thirteen million and fifteen million individuals participate in fantasy football, grossing more than $1 billion a year in revenue. Telscher Decl., Oct. 6, 2008, Ex. 13 at 2.

**D. Licensing Agreements and the Fantasy Baseball Litigation**

*\*3 In years prior to the NFL 2008/2009 regular season, CBS Interactive entered into licensing agreements with Players Inc. Berthelsen Decl. ¶ 16, Nov. 14, 2008 [Docket No. 57]; London Decl. ¶ 9, Oct. 6, 2008. These licensing agreements authorized CBS Interactive (as well as other providers of fantasy football who entered into similar licensing agreements) to use, in connection with its fantasy football games, the "names, likenesses (including without limitation, [jersey] numbers), pictures, photographs, voices, facsimile signatures and/or biographical information" of the individual NFL players who had entered into the Group Licensing Agreements. Telscher Decl., Oct. 6, 2008, Ex. 11 §§ 1(A), 2(A). The last of these licensing agreements involving CBS Interactive expired on February 29, 2008. First Am. Compl. ¶ 15.

In 2005, the fantasy baseball industry began litiga-

tion regarding the rights and obligations implicated by licensing agreements similar to the licensing agreements at issue here. *See C.B.C. Distrib. & Mktg, Inc. v. Major League Baseball Advanced Media, L.P.,* 443 F.Supp.2d 1077, 1080-81 (E.D.Mo.2006). The plaintiff, a provider of fantasy baseball games, sought a declaratory judgment to establish its right to use, without a license, the baseball players' names and statistics in connection with its fantasy baseball products. *Id.* at 1081-82.Finding in favor of the plaintiff, the district court determined that the plaintiff's use of the players' names and playing records did not violate any right of publicity held by the defendants, but that even if it did, the plaintiff enjoyed a First Amendment right to use the players' names and playing records that prevailed over any right of publicity. *See id.* at 1082-83, 1100.The Eighth Circuit affirmed the district court's decision on October 16, 2007, *C.B.C. Distrib. & Mktg, Inc. v. Major League Baseball Advanced Media, L.P.,* 505 F.3d 818 (8th Cir.2006), and the United States Supreme Court denied certiorari on June 2, 2008, *Major League Baseball Advanced Media v. C.B.C. Distrib. & Mktg.,* 128 S.Ct. 2872 (2008).

**E. CBS Interactive Refuses to Renew the Licensing Agreements**

In February 2008, Players Inc. approached CBS Interactive to discuss CBS Interactive's continued use of the names and statistics of the individual players in connection with the fantasy football games that CBS Interactive provided to its customers during the 2008/2009 regular season. London Decl. ¶ 10, Oct. 6, 2008. Players Inc. demanded that CBS Interactive pay the licensing fees, but CBS Interactive refused. *Id.* ¶ 11, First Am. Compl. ¶ 16. Players Inc. informed CBS Interactive that the Eighth Circuit's decision in the fantasy baseball litigation was wrongly decided and that if CBS Interactive failed to pay the licensing fees, Players Inc. would file a lawsuit. First Am. Compl. ¶ 17.

CBS Interactive initiated this action against NFLPA on September 3, 2008, seeking a declaratory judg-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 1151982 (D.Minn.)
(Cite as: 2009 WL 1151982 (D.Minn.))

Page 4

ment extending the Eighth Circuit's ruling in the fantasy baseball litigation to CBS Interactive's use of the football players' names and statistics in connection with its fantasy football games. On September 9, 2008, Players Inc. filed its own lawsuit against CBS Interactive in the United States District Court for the District of Southern Florida. Cole Decl. ¶ 9, Dec. 23, 2008 [Docket No. 72], Ex. 8. NFLPA then moved, on September 30, 2008, to transfer venue of this case to the United States District Court for the Southern District of Florida. That same day, CBS Interactive filed its First Amended Complaint, adding Players Inc. as a defendant.

### III. DISCUSSION

### A. Players Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction

*4 Players Inc. moves to dismiss for lack of personal jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. To survive a motion to dismiss for lack of personal jurisdiction, the plaintiff need only make a prima facie showing of personal jurisdiction over the defendant. *Digi-Tel Holdings, Inc. v. Proteq Telecomms.,* 89 F.3d 519, 522 (8th Cir.1996). For purposes of determining whether the plaintiff has made the necessary prima facie showing, a district court must view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in the plaintiff's favor. *Id.*

Determining whether personal jurisdiction exists is a two-prong inquiry: first, the requirements of the Minnesota long-arm statute must be satisfied, and second, the exercise of personal jurisdiction must comport with due process. *Stanton v. St. Jude Med., Inc.,* 340 F.3d 690, 693 (8th Cir.2003). Because Minnesota's long-arm statute is "coextensive with the limits of due process," the only question is whether the exercise of personal jurisdiction comports with due process. *Minnesota Mining & Mfg. Co. v. Nippon Carbide Indus., Inc.,* 63 F.3d 694,

697 (8th Cir.1995). The exercise of personal jurisdiction comports with due process when a defendant maintains sufficient minimum contacts with the forum state "such that summoning the defendant would not offend traditional notions of fair play and substantial justice." *Pecoraro v. Sky Ranch for Boys, Inc.,* 340 F.3d 558, 561 (8th Cir.2003)."The central question is whether a defendant has purposefully availed itself of the privilege of conducting activities in the forum state and should, therefore, reasonably anticipate being haled into court there." *Id.* at 562.

"With these principles in mind," courts consider the following factors: "(1) the nature and quality of the defendant's contacts with the forum state; (2) the quantity of contacts; (3) the relationship between the cause of action and the contacts; (4) the forum state's interest in providing a forum for its residents; and (5) the convenience of the parties."*Id.* The first three factors are of primary importance, while the last two are "secondary factors." *Minnesota Mining,* 63 F.3d at 697. The third factor distinguishes between specific and general jurisdiction. *Digi-Tel,* 89 F.3d at 523 n. 4. "Specific jurisdiction can only be found if the controversy is related to or arises out of the defendant's contacts with the forum state." *Johnson v. Woodcock,* 444 F.3d 953, 956 (8th Cir.2006) (quotation omitted). By contrast, general jurisdiction requires a showing that the defendant's contacts with the forum state are "continuous and systematic even if there is no relationship between the contacts and the cause of action."*Id.* (quotation omitted).

Before evaluating the quantity and quality of the contacts, the nature of the controversy in this action must first be accurately characterized to allow the Court to determine the relationship between the cause of action and the contacts. Players Inc. narrowly describes this controversy as concerning the use of names and statistics only in the context of fantasy football and CBS Interactive's refusal to renew the licensing agreements it formerly had with Players Inc. The Court disagrees. Properly charac-

terized, the controversy in this action is described more broadly as a challenge to the scope of Defendants' rights of publicity.

**\*5** In arguing that specific personal jurisdiction exists over Player Inc., CBS Interactive alleges that Players Inc. had numerous contacts with Minnesota and that this case arose out of those contacts. Specifically, CBS Interactive identifies the following contacts:

- Players Inc.'s right of publicity in the names and statistics of the individual players emanates from the individual players (some of whom reside and/ or play football in Minnesota) who assign their individual publicity rights to NFLPA pursuant to the Group Licensing Agreements and some of those agreements are executed in Minnesota, Telscher Decl., Oct. 6, 2008, Exs 2, 3 § 1(A);

- the names and statistics of the individual players are generated in numerous football stadiums around the country, including at the Metrodome in Minneapolis, London Decl. ¶ 5, Dec. 23, 2008 [Docket No. 76];

- Players Inc., though not a named party to the Group Licensing Agreements, itself occasionally participates in the execution of the Group Licensing Agreements by sending them to players (some of whom reside and/or play football in Minnesota) and keeping executed copies for its files, Telscher Decl., Dec. 23, 2008, [Docket No. 80] Ex. 3 at 55-60, 84-88;

- Players Inc. has previously licensed a Minnesota-based fantasy football provider for the right to use players' names and statistics and has used that same provider to "power" its own fantasy football game, *Id.*, Ex. 3 at 125-27;

- since the beginning of 2006, Players Inc. has been a party to 187 agreements not covered by the Group Licensing Agreements with individual Minnesota Vikings players who have been singled out by licensees or sponsors to be high-

lighted on product packaging or in print ads and endorsements, *Id.*, Ex. 3 at 191-95, Ex. 19 at Resp. to Interrog. No. 3;

- a portion of the millions of dollars in licensing revenue that Players Inc. receives from providers of fantasy football is paid directly by Players Inc. to football players in Minnesota, *Id .*, Ex. 3 at 195-204; and

- Players Inc. licenses numerous companies to sell products and services (for example, jerseys, video games, and fantasy football games) throughout the United States, including Minnesota, and that all of these products and services bear, at Players Inc.'s insistence, the official logo of Players Inc., *Id.*, Ex. 1 at 7.

Pl.'s Consolidated Opp'n to Mots. to Dismiss or Transfer [Docket No. 87] at 13-20, 33-39. These contacts relate to the process by which Players Inc. acquires its interest as exclusive licensee of the publicity rights from the individual players and the subsequent licensing to third parties. Therefore, the controversy in this action challenging the ability of Players Inc. to exploit the publicity rights in the context of fantasy football, is directly "related to" Players Inc.'s contacts with Minnesota. Although Players Inc. is not a named party to the Group Licensing Agreements, the agreements were executed by the individual players and NFLPA with the explicit purpose of enabling Players Inc. to generate revenue by subsequently licensing to third parties the use of the information encompassed by the Group Licensing Rights. And the agreement between Players Inc. and NFLPA shows that Players Inc. knows that some of the Group Licensing Agreements were likely executed in Minnesota, where at least some of individual players reside.

**\*6** In asserting that minimum contacts are lacking between Players Inc. and Minnesota, Players Inc. emphasizes that because it is not a party to the Group Licensing Agreements with the individual players, it has not had any direct contact with Minnesota residents. The record belies Players Inc.'s

Slip Copy
Slip Copy, 2009 WL 1151982 (D.Minn.)
(Cite as: 2009 WL 1151982 (D.Minn.))

Page 6

contention. Players Inc. plays a role in securing the Group Licensing Agreements by occasionally sending copies of the Group Licensing Agreements directly to individual players;[FN4] Players Inc. has worked directly with individual players in Minnesota on 187 occasions in connection with individual agreements governing licensing activities not covered by the Group Licensing Agreements; and Players Inc. directly pays licensing revenue to individual players in Minnesota. Telscher Decl., Dec. 23, 2008, Ex. 3 at 55-60, 84-88, 191-204; Ex. 19 at Resp. to Interrog. No. 3.

> FN4. Defendants acknowledge Players Inc. occasionally assists in securing the Group Licensing Agreements, but they assert that Players Inc. "has not assisted in securing *any* [Group Licensing Agreements] in Minnesota."Defs.' Mem. in Further Supp. of Mots. [Docket No. 91] at 3-4, 25-26. This assertion is not directly supported by the cited deposition testimony, which relates only to the relative infrequency of Players Inc.'s assistance in securing the agreements, not to the issue of whether Players Inc. assisted in securing agreements in Minnesota. *See* Cole Decl., Jan. 16, 2009, Ex. A at 169:3-16. In addition, Defendants' position places undue emphasis on the location of where the assistance in securing agreements was provided. More germane is the fact that Players Inc. assists in securing agreements with individual players, some of whom reside in Minnesota, regardless of where Players Inc. and the individual players happened to be physically located when the agreement was secured.

Even if the Court were to adopt Players Inc.'s position and conclude that because Players Inc. is not a party to the Group Licensing Agreements, it does not directly contact individual players in Minnesota, such a conclusion would not be dispositive in an analysis of minimum contacts. In *Digi-Tel*

*Holdings,* the Eighth Circuit explained that "contacts with the forum state that are made *on behalf of* the defendant by others may be considered" when, for example, the contacts are "directed by or *primarily for the benefit of* [the defendant]." 89 F.3d at 524-25 (second emphasis added). Here, NFLPA has entered into Group Licensing Agreements with individual players residing in Minnesota expressly providing that the individual players are assigning the publicity rights at issue to "the NFLPA *and its licensing affiliates.*" Telscher Decl., Oct. 6, 2008, Ex. 2 (emphasis added). Whether NFLPA's contacts in securing the Group Licensing Agreements can be properly viewed as having been made "on behalf of" Players Inc. is debatable, but it is undeniable that the contacts were made "primarily for the benefit of" Players Inc., the for-profit entity that is the exclusive worldwide licensor of the publicity rights. This conclusion is reinforced by Defendants' own position that Players Inc., not NFLPA, is the true owner of the publicity rights at issue because the exclusive licensing agreement between Players Inc. and NFLPA constitutes a "de facto assignment." Defs.' Mem. in Further Supp. of Mots. at 40, nn. 25, 26. In elaborating on this argument, Defendants contend that the agreement between Players Inc. and NFLPA gives Players Inc. the right to "exclude all others, including the NFLPA, from its licensing business."*Id.* at 40.Thus, if Defendants' are correct that Players Inc. is the true owner of the publicity rights by virtue of the agreement between Players Inc. and NFLPA, the primary benefit of NFLPA entering into the Group Licensing Agreements flows to Players Inc., not NFLPA, since NFLPA is excluded from engaging in licensing activities.[FN5]

> FN5. Attributing NFLPA's jurisdictional contacts regarding the Group Licensing Agreements to Players Inc. on the ground that those agreements primarily benefit Players Inc. does not require an alter-ego or corporate-veil-piercing theory. *See Digi-Tel Holdings,* 89 F.3d at 523-24, n. 6;*see also In re Genetically Modified Rice Litig.,*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 1151982 (D.Minn.)
(Cite as: 2009 WL 1151982 (D.Minn.))

Page 7

576 F.Supp.2d 1063, 1073 (E.D.Mo.2008) (explaining that under Eighth Circuit law, "the attribution of jurisdictional contacts is not limited to situations where a subsidiary's corporate veil can be pierced under state law") (citing *Anderson v. Dassault Aviation,* 361 F.3d 449, 452 (8th Cir.2004)).

Players Inc.'s agreements with its third-party licensees are additional evidence of contacts with the forum state. Players Inc. argues that the products and services of these third-party licensees being sold in Minnesota is insufficient for purposes of establishing jurisdictional contacts because it "has no control over the sale of products by its licensees" who happen to do business nationally. But when, for example, Players Inc. affixes its official logo to Jared Allen jerseys [FN6] produced by one of its official licensees (or, for that matter, any Minnesota Vikings product sold by an official licensee of Player Inc.), it recognizes, and likely intends, the overwhelming majority of those jerseys will be sold in Minnesota to Minnesota residents. Players Inc.'s does not merely place its "product"-its official logo, which embodies the publicity rights that have been obtained from the individual players-into the stream of commerce. Rather, at least insofar as Minnesota Vikings products are concerned, there is "an intent or purpose to serve the market in the forum State" in that the product is "design[ed] ... for the market in the forum state."*See Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal.,* 480 U.S.102, 112 (1987).

> FN6. Jared Allen plays football for the Minnesota Vikings. *See* Telscher Decl., Dec. 23, 2008, Ex. 31.

*7 Taken in the light most favorable to CBS Interactive, the record shows that Players Inc., through its own contacts with Minnesota as well as the contacts of NFLPA made for the benefit of Players Inc., purposefully availed itself of the privilege of conducting activities in Minnesota and that Players Inc. should have reasonably anticipated being haled into court here. Players Inc.'s relationship with

NFLPA, in combination with the primary benefit of the Group Licensing Agreements and the process by which the agreements are obtained, establishes that Players Inc. has reached out and created "continuing relationships and obligations" with individual players residing in Minnesota. *See Burger King Corp. v.. Rudzewicz,* 471 U.S. 462, 475 (1985). These contacts are directly related to the publicity rights at issue here. The Court finds, therefore, that the due process requirement of minimum contacts with the forum is satisfied and that specific jurisdiction exists over Players Inc. [FN7]

> FN7. Because specific jurisdiction exists over Players Inc., the Court need not address whether general jurisdiction also exists over Players Inc.

The secondary factors of the convenience of the parties and the forum state's interest in providing a forum for its residents, as well as other related factors, ensure that the assertion of jurisdiction comports with fair play and substantial justice. *See Gibson Trucking, Inc. v. Allied Waste Indus., Inc.,* No. 01-710, 2001 WL 1640095, at*6 (D.Minn. Nov. 2, 2001) (citing *Burger King,* 471 U.S. at 476). As previously discussed, Players Inc.'s contacts with Minnesota, show that Players Inc. has purposefully directed its activities at forum residents. Thus, Players Inc. must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 477. The inconveniences claimed by Players Inc., which are discussed more fully in the analysis of the motions to transfer, *see infra* III.C.2, fail to demonstrate the that the exercise of jurisdiction would be "so gravely difficult and inconvenient" as to render Players Inc. at a "severe disadvantage." *Id.* at 478.

**B. Motion to Dismiss for Lack of Personal Jurisdiction over an Indispensable Party**

Defendants argue that Players Inc. is an indispensable party under Fed.R.Civ.P. 19(a) and, relying

again on the argument that personal jurisdiction is lacking over Players Inc., move to dismiss pursuant to Fed.R.Civ.P. 12(b)(7). Because the Court has concluded that personal jurisdiction exists over Players Inc., Defendants' motions to dismiss for failure to join an indispensable party fail, regardless of whether or not Players Inc. is an indispensable party.

### C. Motion to Transfer

Defendants move to transfer venue to the Southern District of Florida under the authority of 28 U.S.C. § 1404(a).Section 1404(a) provides: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."[FN8] In deciding whether to grant a motion to transfer, a district court employs a three-factor balancing test that considers "(1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interests of justice." *Terra Int'l Inc. v. Miss. Chem. Corp.,* 119 F.3d 688, 691 (8th Cir.1997). This list of factors is not exclusive, and a district court's decision on a motion to transfer "require[s] a case-by-case evaluation of the particular circumstances at hand and a consideration of all relevant factors."*Id.* Generally, a plaintiff's choice of forum is given "considerable deference ... and thus the party seeking a transfer ... typically bears the burden of proving that a transfer is warranted."Id, at 695.However, when the plaintiff is not a resident of the selected forum or when the underlying events giving rise to the litigation did not occur in the forum, courts afford a plaintiff's choice of forum "significantly less deference." *Nelson v. Soo Line R.R. Co.,* 58 F.Supp.2d 1023, 1026 (D.Minn.1999) (citations omitted).

> FN8. The parties do not dispute the threshold question of whether the Southern District of Florida is a venue in which the action could have originally been brought.

**\*8** Here, there is no dispute that CBS Interactive is not a resident of Minnesota. In examining the connection between Minnesota and the underlying events of this litigation, CBS Interactive contends that (1) Players Inc.'s assertion of the publicity rights at issue in this litigation affects more than 100,000 fantasy football consumers in Minnesota; (2) individual players, specifically players for the Minnesota Vikings, work and reside in Minnesota; (3) a portion of the revenue earned by Players Inc. in connection with licensing fantasy football games is paid to individual players residing in Minnesota; (4) "at least a portion of the statistics [Players Inc.] seek[s] to license are created by games occurring in [Minnesota]"; and (5) at least some of the Group Licensing Agreements conveying the publicity rights from the individual players are executed in Minnesota. Pl.'s Consolidated Opp'n to Mots. to Dismiss or Transfer at 54-55. These facts link Minnesota to the underlying events that gave rise to this litigation. However, Minnesota does not appear to have any special or superior connection with the underlying events of the litigation in comparison to other fora where individual players and consumers of fantasy football reside. The Court therefore affords less deference to CBS Interactive's choice of Minnesota as a forum. But " 'less' deference does not mean 'no' deference," and Defendants "must still overcome a presumption in favor of [the plaintiff's] selection of Minnesota as a litigation forum." *Burks v. Abbott Labs.,* Civil No. 08-3414, 2008 WL 4838720, at \*2 (D.Minn. Nov. 5, 2008).

### 1. The First-Filed Rule

As an initial matter, the parties dispute the applicability of the "first-filed rule," which provides that "when parallel litigation has been instituted in separate courts," priority is given to "the party who first establishes jurisdiction." *Keymer v. Mgmt. Recruiters, Int'l Inc.,* 169 F.3d 501, 503 n. 2 (8th Cir.1999). The first-filed rule gives a district court discretion to dismiss a later-filed action or transfer it if an action involving the same parties and issues was filed earlier in a different district. *See Slidell, Inc. v. Archer Daniels Midland Co.,* No. Civ.

02-4841, 2003 WL 22050776, at *4 (D.Minn. Sept. 2, 2003) (citing *Anheuser-Busch, Inc. v. Supreme Int'l Corp.,* 167 F .3d 417, 419 (8th Cir.1999) and *Orthmann v. Apple River Campground, Inc.,* 765 F.2d 119, 121 (8th Cir.1985)). However, the first-filed rule "is not intended to be rigid, mechanical, or inflexible, but is to be applied in a manner best serving the interests of justice," and the "prevailing standard is that in the absence of compelling circumstances, the first-filed rule should apply."*Nw. Airlines, Inc. v. Am. Airlines, Inc.,* 989 F.2d 1002, 1005-07 (8th Cir.1993). Two "red flags" that might signal such "compelling circumstances" are (1) the first suit was filed after the other party gave notice of its intention to sue and (2) the first suit was primarily for declaratory relief. *Boatmen's First Nat'l Bank of Kansas City v. Kansas Public Employees Ret. Sys.,* 57 F.3d 638, 641 (8th Cir.1995). Additionally, courts decline to apply the first-filed rule where there is forum shopping or bad faith. *See Alltrade, Inc. v. Uniweld Prods., Inc.,* 946 F.2d 622, 628 (9th Cir .1991); *Equal Employment Opportunity Comm'n v. Univ. of Penn.,* 850 F.2d 969, (3d Cir.1988); *William Gluckin & Co. v. Int'l Playtex Corp.,* 407 F.2d 177, 178 (2d Cir.1969).

**\*9** Defendants assert that even if this action is the first-filed-an issue which they dispute-the rule should not apply because CBS Interactive was engaging in "blatant forum shopping" when it initiated this action in this district to take advantage of arguably favorable law to CBS Interactive announced by the Eighth Circuit in *C.B.C. Distribution.*Defs.' Mem. in Further Supp. of Mots. at 12-13. CBS Interactive levies its own accusation of forum shopping in response, claiming that Defendants' request to transfer venue to the Southern District of Florida is motivated by a perception that the law in that district and circuit is more favorable to their arguments. Pl.'s Consolidated Opp'n to Mots. to Dismiss or Transfer at 63-64. After reviewing the parties' arguments, it appears, not surprisingly, that both CBS Interactive and Defendants are forum shopping. Minnesota is no more closely connected to the controversy in this action than any other for-

um in which an NFL team is located; CBS Interactive most probably chose to litigate in Minnesota to avail itself of Eighth Circuit precedent established by *C.B.C. Distribution,* the fantasy baseball litigation. On the other hand, it is equally likely that Defendants prefer the Southern District of Florida primarily because that court is not bound by the decision in *C.B.C. Distribution* and has issued a decision that Defendants perceive to be favorable to their position. Given the likely forum-shopping by both CBS Interactive and Defendants, the Court declines to rigidly apply the first-filed rule and will instead focus on the three factors typically involved in a motion to transfer pursuant to § 1404.

**2. Convenience of the Parties**

In assessing the relative convenience of the parties, "[t]he logical starting point ... is a consideration of [the parties] residences in relation to the district court chosen by the plaintiff and the proposed transferee district." *Facilitec Corp. v. Omni Containment Sys., LLC,* No. Civ. 03-3187, 2003 WL 21781914, at *1 (D.Minn. July 31, 2003) (quotation omitted). Neither CBS Interactive, NFLPA, nor Players Inc. are residents of either Minnesota or the Southern District of Florida. While CBS Interactive maintains a place of business in Florida, suggesting the Southern District of Florida is more convenient for CBS Interactive, CBS Interactive chose to litigate this action in Minnesota and it would be "paradoxical" for that choice "to be dislodged by any inconvenience it elected to bear in litigating its action in this locale."*See Durabla Mfg. Co. v. Cont'l Cas. Co.,* No. 98-1596, 1998 WL 957250, at *3 (D.Minn. Oct. 26, 1998). And there is little difference in convenience to Defendants, as residents of Virginia and Washington, D.C., between litigating this action in Minnesota or the Southern District of Florida. Rather, Defendants as well as CBS Interactive, are large corporations that have "the financial wherewithal to bear the expense of litigating this action in either forum."*Id.* Therefore, the convenience of the parties is a neutral factor.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

### 3. Convenience of the Witnesses

**\*10** The relevant considerations to evaluating the convenience of witnesses are the number of essential non-party witnesses, their location, and the preference for live testimony. *Coast-toCoast Stores, Inc. v. Womack-Bowers, Inc.,* 594 F.Supp. 731, 734 (D.Minn .1984). Party witnesses and witnesses who are employees of a party are, by contrast, not a "paramount concern ... because it is generally assumed that witnesses within the control of the party calling them, such as employees, will appear voluntarily in a foreign forum." *LeMond Cycling, Inc. v. Trek Bicycle Corp.,* Civ. No. 08-1010, 2008 WL 2247084, at \*3 (D.Minn. May 29, 2008) (quotation omitted). Here, because all of the witnesses that have been identified are employees of either CBS Interactive, NFLPA, or Players Inc, the convenience of witnesses is also a neutral factor.

The location of other sources of proof, such as documentary evidence, is also neutral. As one court has aptly noted, "[w]ith the advent of xerography and other means of document reproduction, the location of documents is no longer entitled to much weight in the transfer of venue analysis, especially where, as here, the parties have the financial capability to complete the necessary copying." *Durabla Mfg.,* 1998 WL 957250, at \*4;*see also Amazin' Raisins Int'l, Inc. v. Ocean Spray Cranberries, Inc.,* No. Civ. 04-3358, 2004 WL 2595896, at \*4 (D.Minn. Nov. 15, 2004) ("[T]he actual physical location of voluminous documents is not a particularly salient factor in a section 1404(a) determination in present day litigation."). Furthermore, the parties have already submitted voluminous documents in connection with the pending motions, and it is unclear what further documents exist that have not previously been gathered.

"Section 1404(a) provides for transfer to a more convenient forum, not a forum likely to prove equally convenient or inconvenient...." *Graff v. Qwest Comme'ns Corp.,* 33 F.Supp.2d 1117, 1121 (D.Minn.1999). Thus, the convenience factors do not favor transfer.

### 4. Interests of Justice

The interests of justice factor is often viewed as being the most important factor. *See Nelson v. Master Lease Corp.,* 759 F.Supp. 1397, 1402 (D.Minn.1991). When evaluating whether the interests of justice warrant transfer, courts typically consider "(1) judicial economy, (2) the plaintiff's choice of forum, (3) the comparative costs to the parties of litigating in each forum, (4) each party's ability to enforce a judgment, (5) obstacles to a fair trial, (6) conflict of law issues, and (7) advantages of having a local court determine questions of local law." *Terra,* 119 F.3d at 696.

In arguing that judicial economy weighs in favor of transfer, Defendants contend that "the civil dockets in the Southern District of Florida are less congested than the civil dockets in the District of Minnesota."Defs.' Mem. in Supp. of Mot. to Transfer [Docket No. 17] at 17. Whatever the relative congestion of the dockets in the Southern District of Florida and this district, the Court is not persuaded by Defendants' argument. "Dockets vary by judge and by time period. Even similar cases filed at the same time are often resolved in different amounts of time, depending on the vagaries of court calendars. Thus, this argument does not weigh in favor of one party over the other." *Amazin' Raisins,* 2004 WL 2595896, at \*5.

**\*11** The remaining factors also are neutral. As previously explained, CBS Interactive's choice of forum is entitled to little deference under the circumstances here. The Court is not persuaded that litigating in Minnesota is more expensive for both parties; the costs of depositions, document review, and the resulting litigation will be much the same whether the matter is tried in Minnesota or Florida. The parties do not contend that there would be any difficulty in enforcing a judgment in either forum, that there would be any obstacles to a fair trial in either forum, or that there are any conflict-of-law issues. Nor have the parties identified any legal issues that would be relevant to the final factor, the advantages of having a local court determine ques-

Slip Copy
Slip Copy, 2009 WL 1151982 (D.Minn.)
**(Cite as: 2009 WL 1151982 (D.Minn.))**

Page 11

tions of local law. Even if there were any such is-
sues, "federal courts are frequently called upon to
interpret laws of other states." *3M Co. v. Icuiti
Corp.,* Civil No. 05-2945, 2006 WL 1579816, at *4
(D. Minn. June 1, 2006).

Defendants argue that CBS Interactive "deliberately
chose to sue the wrong defendant," NFLPA, be-
cause, unlike Players Inc., there are no defects with
regard to personal jurisdiction over NFLPA, and,
therefore, they contend the interests of justice favor
transfer. Defs.' Mem. in Supp. of Mot. to Transfer
at 16-17. In asserting that NFLPA is the "wrong de-
fendant," Defendants return to the argument that
this dispute concerns the now-expired licensing
agreements that CBS Interactive had previously
entered into were with Players Inc., not NFLPA.
But, as CBS Interactive more persuasively argues,
establishing the claims at issue does not necessitate
any consideration of these prior agreements be-
cause they have no bearing on "the question of who
owns the [publicity] rights and who[m] CBS Inter-
active should have sued when it was challenging
the very existence of the rights."[FN9] Pl.'s Consolid-
ated Opp'n to Mots. to Dismiss or Transfer at 60.
Defendants' argument suggests that because Players
Inc. is, in their view, a de facto assignee of the pub-
licity rights, Players Inc. is the only appropriate tar-
get of CBS Interactive's lawsuit. Whether the agree-
ment between Players Inc. and NFLPA constitutes a
"de facto assignment" of the publicity rights to
Players Inc., is not determinative of whether
NFLPA is a proper target of this lawsuit. The de-
cisions Defendants cite in support of their de facto
assignment argument stand for the proposition that
if a licensee is found to be a de facto assignee, he
has standing to sue in his own name to protect his
interests; the cited decisions do not establish that
the right of the licensee (de facto assignee) to sue
precludes the licensor (de facto assignor) from su-
ing. *See Waterman v. Mackensie,* 138 U.S. 252,
255-56 (1891); *Intermedics, Inc. v. Cardiac Pace-
makers, Inc.,* Civ. No. 4-95-716, 1998 WL
35253490, at *5 (D.Minn. Feb. 17, 1998); *MJ &
Partners Rest. Ltd. P'ship v. Zadikoff,* 10 F.Supp.2d

922, 930 (N.D.Ill.1998).

> FN9. Similarly, just because some of the
> negotiations regarding these now-expired
> agreements may have occurred in Florida
> is likewise irrelevant to the controversy in
> this action. The prior agreements and the
> negotiations surrounding them may, as De-
> fendants argue, be more relevant to CBS
> Interactive's antitrust claim. However, as
> explained herein, *see infra* III.D, that claim
> fails as a matter of law.

**\*12** Defendants next argue that the interests of
justice weigh in favor of transfer because CBS In-
teractive initiated this action, "in a forum that was
completely unconnected with the dispute for the
sole purpose of trying to secure what it perceived to
be a favorable forum on the law."Defs.' Mem. in
Supp. of Mot. to Transfer at 16-17. As previously
discussed in the personal jurisdiction context, Min-
nesota is not "completely unconnected" to the con-
troversy in this action, which centers on the rights
of publicity asserted by Players Inc. Those publicity
rights emanate from the individual players, a por-
tion of whom reside in Minnesota, and some of the
Group Licensing Agreements that transfer those
rights to NFLPA (and ultimately to Players Inc.) are
executed by individual players who reside in Min-
nesota. In addition, the assertion of those publicity
rights occurs on a national basis and affects Min-
nesota consumers of products and services related
to the NFL, including consumers of fantasy foot-
ball. Although Minnesota's connection to the con-
troversy in this action may not be comparatively
stronger or weaker than that of any other fora, there
is a sufficient connection.

In summary, the three factors evaluated in a motion
to transfer are neutral. Defendants have therefore
failed to show that transfer to the Southern District
of Florida is warranted.

**D. Motion to Dismiss for Failure to State a
Claim**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. *Hamm v. Groose,* 15 F.3d 110, 112 (8th Cir.1994); *Ossman v. Diana Corp.,* 825 F.Supp. 870, 879-80 (D.Minn.1993). Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party. *Ossman,* 825 F.Supp. at 880. "A motion to dismiss should be granted as a practical matter ... only in the unusual case in which the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey v. City of Herculaneum,* 44 F.3d 667, 671 (8th Cir.1995). Under Rule 8(a) of the Federal Rules of Civil Procedure, pleadings "shall contain a short and plain statement of the claim showing that the pleader is entitled to relief."A pleading must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

Defendants move to dismiss Count IV of CBS Interactive's First Amended Complaint, which asserts that the following alleged acts by Players Inc. constitute monopolization or attempted monopolization in violation of antitrust laws: (1) Players Inc.'s request for licensing fees for CBS Interactive's use of the names and statistics of individual players in connection with its fantasy football products; (2) Players Inc.'s threat that it would refuse to license CBS Interactive and would file suit against CBS Interactive if it continued to operate its fantasy football business without paying the licensing fees; (3) Players Inc.'s filing suit in the Southern District of Florida for, inter alia, alleged misappropriation of Players Inc.'s rights of publicity in the names, images, likenesses, statistics, and biographical information of individual players; and (4) Players Inc.'s similar requests and threats toward other fantasy football providers. First Am. Compl. ¶¶ 33-43. De-

fendants move to dismiss CBS Interactive's antitrust claims on the ground that the alleged requests, threats of litigation, and filing of the Florida action are immunized from liability under the *Noerr-Pennington* doctrine because they are "objectively reasonable efforts" to protect Players Inc.'s interest in the publicity rights.

*\*13* The *Noerr-Pennington* doctrine, which is premised on the First Amendment right to petition the government for redress of grievances, is derived from two antitrust cases decided by the Supreme Court. *See Eastern R.R. President's Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657 (1965). Under the doctrine, the act of filing a lawsuit is viewed as a form of petitioning activity and is therefore immune from antitrust or tort liability. *See Hinshaw v. Smith,* 436 F.3d 997, 1003 (8th Cir.2006). Because "[t]he right to petition means more than simply the right to communicate directly with the government," protection under the doctrine "necessarily includes those activities reasonably and normally attendant to effective petitioning." *In re IBP Confidential Bus. Documents Litig.,* 755 F.2d 1300, 1310 (8th Cir.1985); *see also First Nat'l Bank v. Marquette Nat'l Bank,* 482 F.Supp.2d 514, 524-25 (D.Minn.1979) (concluding that the *Noerr-Pennington* doctrine protected a defendant from liability when the claims against the defendant were "based upon ... litigation activities"), *aff'd,*656 F.2d 191 (8th Cir.1980).[FN10]

> FN10. CBS Interactive concedes that the pre-litigation requests and threats by Players Inc. were activities reasonably and normally attendant to effective petitioning, which implicate the *Noerr-Pennington. See* Pl.'s Consolidated Opp'n to Mots. to Dismiss or Transfer at 90; Defs.' Mem. in Supp. of Mot. to Dismiss [Docket No. 55] at 26-27 n. 5.

The protection afforded under the *Noerr-Pennington* doctrine is not limitless, and an exception

Slip Copy
Slip Copy, 2009 WL 1151982 (D.Minn.)
(Cite as: 2009 WL 1151982 (D.Minn.))

Page 13

exists for litigation found to be "a mere sham intended to disguise tortious or anticompetitive liability." *Datascope Corp. v. Vascular Solutions, Inc.,* 165 F.Supp.2d 933, 936 (D.Minn.2001); *see also Cal. Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 512 (1972). The Supreme Court has explained that this "sham" exception applies only when (1) the litigation is shown to be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and (2) the litigation is subjectively motivated by bad faith in the sense that it is initiated as a "anticompetitive weapon." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60-61 (1993) (quotations omitted). Only when the challenged litigation is objectively meritless may a court proceed to the second step and examine the litigant's subjective motivation. *Id.* at 60.The Eighth Circuit also has elaborated on the sham exception:

> It is only where a defendant's resort to the courts is accompanied or characterized by illegal and reprehensible practices such as perjury, fraud, conspiracy with or bribery of government decision makers, or misrepresentation, or is *so clearly baseless as to amount to an abuse of process,* that the Noerr-Pennington cloak of immunity provides no protection.

*Razorback Ready Mix Concrete Co., Inc. v. Weaver,* 761 F.2d 484, 487 (8th Cir.1985) (emphasis added). The sham exception is "narrow," and CBS Interactive, as the party attempting to invoke the exception, "bears a heavy burden of demonstrating that the lawsuit is objectively *meritless.*" *West Prof 'l Educ. Group Inc. v. Harcourt Brace,* No. 3-95-176, 1995 WL 422651, at *8 (D. Minn. June 2, 1995) (quotation omitted); *see also Hosp. Bldg. Co. v. Trustees of Rex Hosp.,* 791 F.2d 288, 292-93 (4th Cir.1986) (holding that the burden of proving the sham exception is properly on the party attempting to invoke it) (citing *Cal. Motor Transp.,* 404 U.S. at 518 (Stewart, J., concurring)).

*14 CBS Interactive argues that the litigation activ-

ities by Players Inc. were objectively baseless because there could be no realistic expectation of success in light of *C.B.C. Distribution,* the fantasy baseball litigation, as well as "abundant case law from the Supreme Court, federal appellate courts, and other courts in the modern era" addressing the interplay of publicity rights under state law and the First Amendment. Pl.'s Consolidated Opp'n to Mots. to Dismiss or Transfer at 92-93. Defendants contest whether the law is well settled, claiming that courts in other jurisdictions employ an approach to the interplay of publicity rights and the First Amendment different from the Eighth Circuit's approach in *C.B.C. Distribution.*They also rely on legal commentators' criticism of the Eighth Circuit's articulation and application of the law in *C.B.C. Distribution*[FN11] and contend that the facts in this case are such that even under the Eighth Circuit's approach in *C.B.C. Distribution,* the result here would be different. Defendants conclude, therefore, that Players Inc.'s litigation activities were not objectively baseless. The Court agrees.

> FN11.*See, e.g.,* Patrick K. Thornton & Christopher James, *Down Two Strikes, Is Major League Baseball Already Out?: How the 8th Circuit Balked to Protect the Right of Publicity in C.B.C. v. MLP, Advanced Media,* 50 S. Tex. L.Rev. 173, 175-76 (2008) (arguing that the district court and the Eighth Circuit in *C.B.C. Distrib. & Mktg,*"exceeded the limits of the First Amendment" and "wrongly sided with CBC").

In *Prof'l Real Estate Investors,* the Court suggested that the standard for determining whether a litigation is objectively baseless is similar to the standard for attorney sanctions under Rule 11 of the Federal Rules of Civil Procedure. 508 U.S. at 60. Litigation is not objectively baseless so long as it "was arguably 'warranted by existing law' or at the very least was based on an objectively 'good faith argument for the extension, modification, or reversal of existing law.'" *Id.* (quoting Fed.R.Civ.P. 11). The ana-

logy to the Rule 11 standard is supported by the Eighth Circuit's explanation that the litigation must be "so clearly baseless as to amount to an abuse of process." *Razorback,* 761 F .2d at 487. Here, aside from *C.B.C. Distribution* and the Florida decision cited by Defendants,[FN12] there appear to be no other decisions that have addressed the interplay between publicity rights and the First Amendment in the context of the fantasy sports industry. This case seemingly presents the first opportunity to construe *C.B.C. Distribution* and consider its application as a broader principle of law. Given these circumstances, the Court views Players Inc.'s litigation activities as amounting to a good faith argument for the extension, modification, or reversal of existing law. Significantly, the fact that some legal commentators apparently agree with Defendants that *C.B.C. Distribution* was wrongly decided, buttresses their good faith argument. Moreover, Players Inc.'s argument goes beyond merely seeking to reverse existing law. Players Inc. also argues that the facts of this case are sufficiently distinguishable from those in *C.B.C. Distribution* as to warrant a different result. Although Players Inc. may not prevail with their argument, Players Inc. should not be exposed to antitrust liability for making the argument, which would have a chilling effect on the right to petition.

> FN12. In *Gridiron.com, Inc. v. Nat'l Football League, Player's Ass'n, Inc.,* the court rejected the argument that a fantasy football provider had a First Amendment right to the unlicensed use of players' names and statistics in connection with its fantasy football games. 106 F.Supp.2d 1309, 1315 (S.D.Fla.2000).

**\*15** CBS Interactive has failed to carry the heavy burden of showing that the litigation activities by Players Inc. were objectively baseless in the sense that they amounted to an abuse of process, and, thus, Players Inc.'s litigation activities do not fall within the sham exception to the *Noerr-Pennington* doctrine. Accordingly, Players Inc.'s litigation

activities are immune from antitrust liability. Because Defendants motions to dismiss the antitrust claims are granted on the basis of the *Noerr-Pennington* doctrine, the Court will not address Defendants' argument that CBS Interactive has failed to plead its antitrust claims with the sufficient factual specificity.

**E. Summary Judgment**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. *Ludwig v. Anderson,* 54 F.3d 465, 470 (8th Cir.1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir.1995).

CBS Interactive argues that it is entitled to summary judgment on Count I of the First Amended Complaint, which seeks a declaration that to the extent that CBS Interactive's fantasy football game infringes on Defendants' right of publicity with regard to the names and statistics of the individual players, the First Amendment supersedes such right. First Am. Compl. ¶¶ 20-22. CBS Interactive argues that the material facts in this case concerning the nature of the information used and the claimed right of publicity are the same as those in *C.B.C. Distribution.*Thus, the Eighth Circuit's decision in *C.B.C. Distribution* commands the same result here. Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. [Docket No. 24] at 12. *C.B.C. Distribu-*

*tion* centered on a fantasy baseball provider's use of the " 'names, nicknames, likenesses, signatures, pictures, playing records, and/or biographical data of each players' in an interactive form in connection with its fantasy baseball products." 505 F.3d at 823. The Eighth Circuit determined that the fantasy baseball provider used this information as a symbol of the players' identity and for commercial advantage, and, therefore, such use violated the players' rights of publicity under Missouri law. *Id.* at 822-23.The court concluded however that "[t]he Supreme Court has directed that state law rights of publicity must be balanced against first amendment considerations, and here we conclude that the former must give way to the latter." *Id.* at 823 (citation omitted). In so concluding, the court noted that the information used in the fantasy football game "is all readily available in the public domain, and it would be strange law that a person would not have a first amendment right to use information that is available to everyone."*Id.*

**\*16** In opposing summary judgment, Defendants argue that: (1) this Court lacks subject matter jurisdiction as to the claim against NFLPA; (2) the summary judgment motion is "premature" given the procedural posture of this case; and (3) there are several genuine issues of material fact that distinguish this case from *C.B.C. Distribution,* which preclude a grant of summary judgment.[FN13] Arguing in the alternative, Defendants request under Rule 56(f) of the Federal Rules of Civil Procedure that the Court delay ruling on the summary judgment motion to permit additional discovery.[FN14]

> FN13. Defendants also repeat their arguments regarding personal jurisdiction and venue as additional grounds for denying the motion for summary judgment. In light of the Court's decision on personal jurisdiction and venue, *see infra* III.A-C, these arguments fail.

> FN14. Magistrate Judge Susan R. Nelson previously allowed the parties to conduct limited jurisdictional discovery. *See* Oct.

28, 2008 Order [Docket No. 46] at 4.

### 1. Subject Matter Jurisdiction

Defendants argue that subject matter jurisdiction is lacking as to CBS Interactive's claim for declaratory relief against NFLPA because the claim fails to state a case or controversy. The Supreme Court in *Medimmune, Inc. v. Genentech, Inc.,* 549 U.S. 118 (2007), recently addressed the standard for evaluating whether a declaratory judgment claim states a case or controversy. The dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admi[t] of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* at 127 (quotation omitted) (alteration in original). In short, " 'the question ... is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " *Id* . (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.,* 312 U.S. 270, 273 (1941)).

Defendants argue that there is no case or controversy between CBS Interactive and NFLPA because (1) NFLPA has never been involved in licensing the publicity rights to CBS Interactive, (2) NFLPA itself has made no claim or charge against CBS Interactive of infringement of the publicity rights, and (3) Players Inc. (as de facto assignee of the publicity rights) has the "exclusive right" to grant licenses and the right to maintain actions against infringers. Defs.' Mem. in Opp'n to Mot. for Partial Summ. J. [Docket No. 71] at 16-17.

First, the fact that NFLPA does not license the publicity rights is irrelevant as it is fails to recognize the extent of CBS Interactive's claims. The agreement between NFLPA and Players Inc. makes abundantly clear that NFLPA is the owner of the publicity rights:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 1151982 (D.Minn.)
(Cite as: 2009 WL 1151982 (D.Minn.))

Page 16

Players Inc agrees that every use of the [publicity rights] by Players Inc or any sublicensee shall inure to the benefit of NFLPA and that neither Players Inc nor any sublicensee shall acquire, at any time, any title or interest in the [publicity rights] by virtue of any use [Players Inc.] or any sublicensee may make of such [publicity rights].

Telscher Decl., Oct. 6, 2008, Ex. 3, § 11(B). CBS Interactive's claim alleges that it has a First Amendment right to use names and statistics in connection with fantasy football. This claimed interest is undeniably "adverse" to NFLPA's legal interest in the names and statistics as the owner of the publicity rights under the Group Licensing Agreements. *See Medimmune,* 549 U.S. at 127.

**\*17** Second, the record refutes Defendants' assertion that NFLPA never levied a charge against CBS Interactive for infringing on the publicity rights. CBS Interactive has submitted evidence that representatives from both Players Inc. and NFLPA (specifically, NFLPA's staff counsel, Joseph Nahra) participated in discussions between February and August 2008, in which the threats of litigation for infringement were allegedly made. London Decl. ¶ 10, Oct. 6, 2008. In addition, CBS Interactive asserts that Defendants never distinguished between the interests of Players Inc. and NFLPA in those discussions. *Id.* While Defendants assert in their brief that NFLPA "did not make any charge of unauthorized use of the [publicity rights] against CBS Interactive," there is no evidence offered to create a genuine fact issue that NFLPA participated in the discussions between February and August. Defs.' Mem. in Opp'n to Mot. for Partial Summ. J. at 17.

Lastly, Players Inc.'s right under its agreement with NFLPA to maintain actions for infringement of the publicity rights does not preclude NFLPA from bringing its own infringement actions. On this point, Defendants provide the following block-quote of the agreement:

The NFLPA hereby grants to [Players Inc.] and [Players Inc.] hereby accepts the *exclusive* world-

wide right, license, and privilege of utilizing the [publicity rights], including *the right to grant sublicenses* of one or more such [publicity rights] ...*full discretion* as to the manner in which the [publicity rights] are to be used, [as well as *the right to* ] *commence or prosecute ... any claims or suits in its own name* or in the name of NFLPA or join NFLPA as a party thereto.

Defs.' Mem. in Opp'n to Mot. for Partial Summ. J. at 8 (sixth alteration in original). In the actual agreement, however, more than 22 subparagraphs intervene between the words, "full discretion as to the manner in which the [publicity rights] are to be used" and the words, "commence or prosecute." Contrary to what is insinuated by the block-quote, the agreement does not expressly provide Players Inc. with "full discretion as to the right to commence or prosecute claims or suits."In its entirety, the provision dealing with the commencement or prosecution of claims or suits contemplates an arrangement in which Players Inc. and NFLPA will both participate:

Players Inc further agrees to assist NFLPA to the extent necessary in the procurement of any protection for the [publicity rights] or to protect any of the [publicity rights], and Players Inc, if it so desires, may commence or prosecute at its own expense any claims or suits in its own name or in the name of NFLPA or join NFLPA as a party thereto. Players Inc shall notify NFLPA in writing of any infringement or limitations.

Telscher Decl., Oct. 6, 2008, Ex. 3, § 8(B). Another section of the agreement reinforces this cooperative litigation relationship:

If lawsuits or other types of action are instituted against Players Inc because of its use ... of the [publicity rights], Players Inc shall notify NFLPA immediately and NFLPA shall cooperate with Players Inc ... in the defense of any and all such suits or actions. Players Inc and NFLPA agree to confer on the allocation of the expenses of such defenses based upon the particular facts and circumstances involved in a suit.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**\*18** Telscher Decl., Oct. 6, 2008, Ex. 3, § 17. In short, nothing about the agreement between Players Inc. and NFLPA requires the conclusion that no case or controversy exists between CBS Interactive and NFLPA.

### 2. Prematurity

Defendants argue that because they have not yet filed an answer to CBS Interactive's First Amended Complaint, it would be premature for the Court to grant the motion for partial summary judgment at this time. In *Stuart Inv. Co. v. Westinghouse Elec. Corp.,* the court observed:

Rule 56... allows the presentation by a claimant of such a motion, "at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party."In its original language the rule allowed the making of such a motion only after the pleading in answer to the claim had been served. But although a motion by a claimant for summary judgment, served before the service of answer to his complaint may not be denied on the ground that it is necessarily and inevitably tendered too early, the general cautions against the allowance of such motions ... must be kept in view.

11 F.R.D. 277, 280 (D.Neb.1951); *see also First Am. Bank, N.A. v. United Equity Corp.,* 89 F.R.D. 81, 87 (D.D.C.1981) (recognizing that "a court exercises its discretion in determining whether there may exist material issues of fact, and therefore, it may postpone its decision on a motion for summary judgment to consider further pleadings"). The filing of an answer is not a prerequisite to the consideration of a motion for summary judgment, *HS Res., Inc. v. Wingate,* 327 F.3d 432, 440 (5th Cir.2003), but "district courts are permitted to dismiss a motion for summary judgment without prejudice if it is filed before any party answers," *Tyson v. Tanner,* No. 08-4445, 2008 WL 4948769, at \*3 (E.D.La. Nov. 18, 2008).

Although Defendants have not yet filed an answer in this action, they have filed several briefs and voluminous supporting documents that respond substantively to CBS Interactive's motion and the factual allegations that form the basis of its claims. *See First Am. Bank,* 89 F.R.D. at 87 (deferring its decision on a summary judgment motion when defendants had not yet filed an answer "or *oppositions of a substantive nature* to the motion for summary judgment") (emphasis added). The Court finds Defendants' prematurity argument unavailing in the face of the evidentiary record that has been submitted by the parties, the pre-trial discovery allowed, and the several months that have elapsed since the suit was filed.

### 3. Genuine Issues of Material Fact

In arguing that there are genuine issues of material fact that preclude summary judgment, Defendants focus on the "package" of player information used by CBS Interactive in its fantasy football game. Defendants' position is that here, the package of information is more comprehensive than it was in *C.B.C. Distribution.*Specifically, Defendants assert that in *C.B.C. Distribution,* the package was confined to players' names and statistics, while here, CBS Interactive uses names and statistics in conjunction with "images, biographical information, and items incorporating their personality, reputation[,] and character."Defs.' Mem. in Opp'n to Mot. for Partial Summ. J. at 29-30.

**\*19** In *C.B.C. Distribution,* the Eighth Circuit found that the players had rights of publicity in their names and statistics, and thus, the unauthorized use of the names and statistics constituted a violation of those rights. 505 F.3d at 822-23. The court then proceeded to analyze whether the manner in which the fantasy baseball provider used the names and statistics implicated the First Amendment. In concluding that it did, the court explained:

We ... find no merit in the argument that CBC's use of players names and information in its fantasy

Slip Copy
Slip Copy, 2009 WL 1151982 (D.Minn.)
**(Cite as: 2009 WL 1151982 (D.Minn.))**

Page 18

baseball game is not speech at all. We have held that "the pictures, graphic design, concept art, sounds, music, stories, and narrative present in video games" is speech entitled to first amendment protection. *See Interactive Digital Software Ass'n v. St. Louis County, Mo.,* 329 F .3d 954, 957 (8th Cir.2003). Similarly, here CBC uses the "names, nicknames, likenesses, signatures, pictures, playing records, and/or biographical data of each player" in an interactive form in connection with its fantasy baseball product. This use is no less expressive than the use that was at issue in Interactive Digital.

*Id.* at 823.The package of player information that CBS Interactive uses is no different than that described by the Eighth Circuit-it consists of names, player profiles, up-to-date statistics, injury reports, participant blogs, pictures, images, and biographical information. *See* London Decl. ¶ 7, Oct. 6, 2008; Feffer Decl. ¶ 4, Dec. 23, 2008 [Docket No. 73]. Thus, like in *C.B.C. Distribution,* the package of information used here comes within the ambit of the First Amendment.[FN15] The Court discerns no difference between the package of information at issue here and that which was at issue in *C.B.C. Distribution* that would impact the balancing of publicity rights against First Amendment considerations.

> FN15. The flaw in Defendants' argument is the assertion that the package of information in *C.B.C. Distribution* consisted of only names and statistics. The language quoted above from the Eighth Circuit's opinion is to the contrary. While it is true that the court confined the issues of whether the players had a right of publicity, and, if so, whether that right had been violated to only the use of names and statistics, the court's analysis under the First Amendment considered how the fantasy baseball provider was using or presenting those names and statistics in conjunction with pictures, biographical data, and other information. *See C.B.C. Distrib.,* 505 F.3d at 823.

Defendants next argue that the manner in which CBS Interactive uses the package of player information amounts to a greater exploitation of publicity rights than the use in *C.B.C. Distribution.*Defendants claim that there is a stronger implication of the economic and noneconomic interests vindicated by the rights of publicity, and, therefore, the balance between the publicity rights and the First Amendment interests in the use of information readily available in the public domain is not necessarily the same here as it was in *C.B.C. Distribution.*The Eighth Circuit suggested in *C.B.C. Distribution* that the interests protected by the rights of publicity might be balanced differently against the First Amendment if the package of information were presented in such a manner as to give rise to a danger that consumers would get the "false impression that some particular player ... is endorsing [the fantasy sports provider's] product." *Id.* at 824;*see also Cardtoons, L.C. v. Major League Baseball Players' Ass'n,* 95 F.3d 959, 975 (10th Cir.1996) (indicating that economic interests typically protected by publicity rights are "most persuasive in the context of advertising," such as when a celebrity's likeness is repeatedly used "to sell products").

**\*20** Defendants claim that CBS Interactive presents the package of player information "for the undisputed purpose of marketing and promoting participation in fantasy football games, as well as to drive traffic to its website."Defs.' Mem. in Opp'n to Mot. for Partial Summ. J. at 32. But in *C.B.C. Distribution,* the fantasy baseball provider, like CBS Interactive, used the "players' identities in its fantasy baseball products *for purposes of profit,*" yet balancing the publicity rights against First Amendment considerations nonetheless required that the "the former must give way to the latter." 505 F.3d at 822-23.

Defendants also argue that CBS Interactive's use of player information gives rise to a fact issue regarding whether CBS Interactive's fantasy football consumers might "mistakenly believe that the pictured [players] endorse [CBS Interactive's] website."*Id.*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 1151982 (D.Minn.)
(Cite as: 2009 WL 1151982 (D.Minn.))

Page 19

at 31.In support, Defendants submit to two printouts of CBS Interactive's website, CBSSports.com. *See* Cole Decl., Dec. 23, 2008, Exs. 9, 11. The first, consisting of four pages, includes pictures of two football players accompanied by the following text: "Will the stars be aligned? Forget the drama, Dave Richard and Jamey Eisenberg disagree on what to do with Tony Romo and Terrell Owens in Week 16."*Id.*, Ex. 9. In large bold letters at the top of the first page are the words, "Fantasy News"; other players' names appear on the pages, along with various statistics, rankings of the players by their position, links to other stories, and polls. *Id.* The pages also include links to analyses, projections, and recommendations by sports writers. *Id.* Advertisements for CBS Interactive's fantasy sports products appear on the pages, as do advertisements for third parties. *Id.* The second printout includes a photograph of Tom Brady, the quarterback for the New England Patriots, along with biographical information and statistics in various categories for Tom Brady's professional football career. *Id.*, Ex. 11. Other information is given in sections such as "Fantasy Trends," "ACURA Power Projections," "Injury Report," "Fantasy Analysis," "Recent Trades," and "Rank Among Leaders." *Id.* By way of example, one section, entitled, "Latest News," provides the following information:

**Brady 'doing well' in recovery:** Tom Brady says he's doing well in his recovery from knee surgery. The New England Patriots QB made an unpublicized appearance Wednesday with his girlfriend, model Gisele Bundchen, at the annual Goodwill Thanksgiving dinner in Boston where they served food. He told a TV station that he's "doing well" more than two months after a season-ending injury to his left knee in the opener. The television station's Web site said Brady appeared to be walking without a limp. He had an operation for torn ligaments Oct. 6 and subsequent surgeries after a post-operative infection developed. He has been rehabilitating this month at Gillette Stadium in Foxborough.

*21 *Id.* Advertisements for a third party, as well as CBS Interactive's own advertisements for its fantasy sports products also appear in separate sections of the pages. *Id.*

The printouts of CBS Interactive's website fail to demonstrate specific facts that support the assertion that the manner in which CBS Interactive presents the package of player information could give the false impression of an endorsement. The manner in which the information appears does not demonstrate or imply any connection between the players and the advertisement such that one could mistakenly believe that an endorsement is being made. Indeed, as CBS Interactive persuasively argues, the manner in which the player information is presented is akin to newspapers and magazines, which routinely display pictures and information about celebrities, including professional athletes; however, "[n]o one seriously believes that the subjects of news reports are endorsing the company that provides the report" nor the products and services advertised by third parties who have purchased advertising space in the newspaper or magazine. Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. at 10.

Finally, the Eighth Circuit in *C.B.C. Distribution* specifically noted that baseball is the "national pastime" and that there is an "enduring fascination" in the statistics of baseball. *Id.* at 823 (quotations omitted). Defendants argue that it is not clear whether the public's interest in football statistics is equal in degree to the interest in baseball statistics, and, therefore, "there may be ... weaker First Amendment interests at stake in this case, ... which would lead to a different balancing of First Amendment and publicity rights interests than in [*C.B.C. Distribution* ]." Defs.' Mem. in Opp'n to Mot. for Partial Summ. J. at 34. The Court doubts that the Eighth Circuit intended in *C.B.C. Distribution* to articulate some special application of First Amendment jurisprudence to cases involving baseball only. Accordingly, the Court declines to indulge in a philosophical debate about whether the public is

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

more fascinated with baseball or football or the statistics generated by each. Suffice it to say that there is no dispute that both professional baseball and professional football and the statistics generated by both sports are closely followed by a large segment of the public. Consumers of fantasy football (apparently the most popular fantasy game in the fantasy sports industry), like consumers of fantasy baseball, closely track player statistics.[FN16] Telscher Decl., Oct. 6, 2008, Ex. 10 at 16. In short, that this case concerns football whereas *C.B.C. Distribution* concerned baseball is a distinction without a difference.[FN17]

> FN16. A strong argument can be made that professional football is more popular than professional baseball. The Nielsen Company reports that "[o]f the top-40 sports telecasts since 1961, all but four telecasts were Super Bowls."*See* Aaron Lewis, *The Nielsen Company's Guide to Super Bowl XLIII* at 2 (Jan. 23, 2009), available at http://www.nielsenmedia.com (search "Super Bowl"; then follow "4. The Nielsen Company's Guide to Super Bowl XLIII [pdf] [100KB]" hyperlink). The 2008 Super Bowl attracted approximately 97.5 million viewers and "was the most-watched TV broadcast in 2008."*Id.* at 1.

> FN17. Although the Court has found no distinction in this legal context between football and baseball, it is mindful that the shape of the ball in the athletic context is a distinction with very significant differences.

The record before the Court fails to reveal any genuine issues of material fact. Because the Eighth Circuit's decision in *C.B.C. Distribution* is controlling, CBS Interactive is entitled to judgment as a matter of law.

**4. Rule 56(f)**

**\*22** Finally, Defendants argue in the alternative that the Court should delay ruling on the summary judgment motion and allow additional discovery.Rule 56(f) of the Federal Rules of Civil Procedure provides:

If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its position, the court may:

(1) deny the motion;

(2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be taken; or

(3) issue any other just order.

Rule 56"does not require trial courts to allow parties to conduct discovery before entering summary judgment." *Humphreys v. Roche Biomed. Labs., Inc.,* 990 F.2d 1078, 1081 (8th Cir.1993). Instead, a party invoking Rule 56(f)'s protection must "make a good faith showing that postponement of the ruling would enable it to discover additional evidence which might rebut the movant's showing of the absence of a genuine issue of material fact." *Robinson v. Terex Corp.,* 439 F.3d 465, 467 (8th Cir.2006).

As the basis for their Rule 56(f) request for additional discovery, Defendants again rely on the argument that the scope of the player information used by CBS Interactive and the extent to which CBS Interactive exploits that information could imply an endorsement, which might significantly alter the balance between the publicity rights and the First Amendment interests. Defendants contend that they are entitled to wide-ranging discovery relevant to this argument, including (1) how the use of information varies across the different games that are offered and at different times of the year, (2) the extent to which CBS Interactive is able to "draw consumers and advertisers to its website" through the use of player information, (3) how the use of player information is intended to drive consumers

Slip Copy
Slip Copy, 2009 WL 1151982 (D.Minn.)
(Cite as: 2009 WL 1151982 (D.Minn.))

Page 21

to CBS Interactive's fantasy football games, (4) the degree to which certain "star players" are featured more prominently than other "lesser known players," and (5) CBS Interactive's business strategy regarding the use of player information. Defs.' Mem. in Opp'n to Mot. for Partial Summ. J. at 39-46.

CBS Interactive responds that Defendants "had ample opportunity to review CBS Interactive's publicly available website" and the news reporting portion, which is available all year long. Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. at 13-14. Although some of CBS Interactive's fantasy football games are accessible only during the NFL regular season, other games continue to be accessible and the use of information is not appreciably different across the different games. Furthermore, because CBS Interactive filed its motion for summary judgment on October 6, 2008, Defendants could have reviewed these publicly available games before the regular season ended and the games became inaccessible in January.

Since the fantasy baseball litigation began in 2005, the parties undoubtedly were well aware of the likelihood of similar litigation concerning fantasy football. The specific dispute at the center of this litigation has been ongoing for more than a year. The record shows that during this time, CBS Interactive's fantasy games and the manner in which player information is used therein were publicly available. Courts have declined to grant a Rule 56(f) continuance to allow for discovery when the information sought to be discovered was publicly available. *See King v. Burlington N. & Santa Fe Ry. Co.,* 538 F.3d 814, 819 (7th Cir.2008) (affirming a district court's denial of a request under Rule 56(f) for a continuance to conduct discovery when the information sought to be discovered was publicly available); *Sage Realty Corp. v. Ins. Co. of N. Am.,* 34 F.3d 124, 128 (2d Cir.1994) (holding that a Rule 56(f) request was properly denied when, among other things, the information sought to be discovered was publicly available); *Players, Inc. v. City of New York,* 371 F.Supp.2d 522, 533 (S.D.N.Y.2005)

(denying a motion under Rule 56(f) when, among other reasons, the information sought to be discovered was publicly available). In addition, although no discovery on the merits has occurred, the parties have engaged in limited jurisdictional discovery, and CBS Interactive has provided the Court with hundreds of "screen shots" that depict the fantasy football games offered in the 2008 season. London Decl. ¶ 8, Jan. 16, 2009 [Docket No. 98], Ex. 16. This information confirms that the package of player information and the manner in which CBS Interactive exploits that information is not appreciably different from that in *C.B.C. Distribution* and does not support any inference of a suggestion of an endorsement.[FN18]

> FN18. The Court is similarly not convinced by Defendants' argument that discovery is necessary regarding matters such as the business strategies and intent behind CBS Interactive's use of player information. Whether CBS Interactive used player information in a manner that might imply an endorsement can be determined by looking to the manner in which player information was used, without any need to consider the subjective strategy or intent behind the use. If the use of information implied an endorsement, the fact that the user did not subjectively intend to imply such an endorsement would not change the analysis. Likewise, if the manner in which the information is used utterly fails to convey the implication, it would not matter that the user subjectively intended to imply an endorsement.

**\*23** Having reviewed the voluminous record and thoroughly considered the legal issues, the Court concludes that Defendants have not carried their burden of showing that delaying the ruling on the summary judgment motion would enable them to discover evidence that might rebut CBS Interactive's showing of the absence of a genuine issue of material fact. Defendants' Rule 56(f) request is

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

therefore denied.[FN19]

> FN19. The decision that CBS Interactive is entitled to summary judgment on its claim for a declaration that its First Amendment right to use the names and statistics of the individual players in connection with its fantasy football game supercedes Defendants' right of publicity renders moot CBS Interactive's claim that Defendants' state law publicity rights are preempted by federal copyright law (Count II) and its claim that its fantasy football games do not infringe on Defendants' publicity rights (Count III).

### IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Players Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction [Docket No. 33] is **DENIED;**

2. Defendants' Motions to Dismiss [Docket Nos. 43 and 53] are **GRANTED** as to the failure to state a claim and **DENIED** as to the failure to join an indispensable party;

3. Defendants' Motions to Transfer Venue [Docket Nos. 15 and 50] are **DENIED;**

4. Count IV of the First Amended Complaint [Docket No. 21] is **DISMISSED WITH PREJUDICE;**

5. CBS Interactive Inc.'s Motion for Partial Summary Judgment [Docket No. 22] is **GRANTED;** and

6. Counts II and III of the First Amended Complaint [Docket No. 21] are **DISMISSED** as moot.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

D.Minn.,2009.
CBS Interactive Inc. v. National Football League Players Ass'n, Inc.
Slip Copy, 2009 WL 1151982 (D.Minn.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.